UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| VEILA VEYONNE ADAMS,<br>ANTHONY L. CERRETA,<br>SALVATORE SAM DIBENEDETTO,<br>HOWARD DUBMAN,<br>PETER FONDACO,<br>GLORIA ANNETTE PEARSON JENKINS,<br>BARBARA ANNE JOHNSON,<br>JOSEPH A. LATTINI,<br>CRESSIE M. MAYES, Individually and as<br>Representative of HENRY FOSTER MAYES, and<br>ARTHUR J. SMITH<br><br>PLAINTIFFS,<br><br>v.<br><br>TETLEY USA, INC.<br><br>DEFENDANT. | CIVIL ACTION NO.<br>303 CV 649 (JBA)<br><br><br><br><br><br><br><br><br><br>APRIL 6, 2004 |

MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

DEFENDANT,
TETLEY USA INC.

Theodore J. Tucci (ct05249)
Michael J. Kolosky (ct22686)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

**Table of Contents**

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND .............................................................................. 2

III. LEGAL STANDARD .......................................................................................... 5

    A.    Summary Judgment Standard ................................................................... 5

    B.    Legal Standard Applicable to Contractual Vesting Claims ..................... 6

    C.    Legal Standard Applicable to Breach of Fiduciary Duty Claims ............ 9

IV. ARGUMENT ..................................................................................................... 12

    A.    Plaintiffs' Retiree Medical Benefits Did Not Vest ................................. 12

        1.    The Plan Documents Do Not Promise Lifetime Benefits ........... 12

        2.    Plaintiffs' Individual Retirement Agreements Do Not Promise Lifetime Medical Benefits ........................................................... 15

    B.    Tetley Did Not Breach its Fiduciary Duty to Plaintiffs .......................... 21

V. CONCLUSION .................................................................................................. 29

## I.  **INTRODUCTION**

In 2002, defendant Tetley USA Inc. ("Tetley") announced that it would be eliminating medical benefits coverage for retirees. In a letter to its retired employees dated March 1, 2002, Tetley explained the reasons behind its decision and provided retirees with assistance and information about obtaining alternative medical coverage. As set forth in the March 1st letter, Tetley's retiree medical benefits program ended on June 1, 2002.

Plaintiffs are ten former Tetley employees (and one covered spouse) whose medical benefits were terminated when Tetley eliminated its retiree medical benefits program. They allege that their benefits were contractually vested under the terms of Tetley's plan documents and, in some cases, their individual retirement agreements. Alternatively, plaintiffs claim that Tetley wrongfully led them to believe that their retiree medical benefits were vested when in fact Tetley retained the right to terminate those benefits at any time, thereby breaching its fiduciary duty to communicate with them honestly about the plan. Both plaintiffs' breach of contract and breach of fiduciary duty claims are brought under section 502 of ERISA.

Tetley is entitled to summary judgment on all claims asserted by plaintiffs. As is more fully set forth below, Tetley has a long history of accurately and consistently informing its employees of matters relating to the operation of the medical benefits plan. All of the plan documents relating to retiree medical benefits, including the summary plan descriptions, contain express reservation of rights provisions explaining Tetley's right to amend or to terminate any aspect of the medical benefits plan at any time. Furthermore, none of these documents or other communications to employees can reasonably be construed as promising them lifetime medical benefits. For these reasons, Tetley's motion for summary judgment should be granted.

## II. FACTUAL BACKGROUND[1]

In 1975, Tetley sponsored a group welfare benefits plan for its employees. (R56 Stmt. ¶ 4.) Tetley arranged for a group policy issued by John Hancock Mutual Life Insurance Company ("John Hancock policy") to provide eligible employees with a variety of coverages, including life insurance, disability insurance, and medical benefits. (Id.) Employees were eligible to continue receiving medical benefits through retirement provided that they satisfied applicable requirements. (Id.) Although Tetley renewed the policy and amended the plan over the years, retired employees generally remained eligible to receive medical benefits through retirement. At various times during the existence of the plan, employees could also elect to have their medical benefits administered by a participating HMO rather than John Hancock. (Id. ¶ 6.)

Tetley had a practice of regularly informing employees about the benefits available to them including the medical benefits available to retirees. (See id. ¶¶ 11-16.) This information was primarily communicated through summary plan descriptions ("SPDs") which Tetley regularly distributed to its workforce. (App. 3-6, 8-10.) Tetley issued a total of five SPDs describing availability of retiree medical benefits from 1975 to 1995. (App. 3-6, 8.) While the contents of the SPDs were updated to reflect various changes to the available benefits, each of the SPDs Tetley issued contained an express reservation of rights informing employees that Tetley had the right to amend or terminate their welfare benefits at any time. (R56 Stmt. ¶¶ 20-21, 25, 28-30, 33, 39.) None of the SPDs contained language that is reasonably susceptible to being interpreted as promising lifetime retiree medical benefits. (App. 3-6, 8.)

---

[1] The factual background relating to this case is more fully set forth in the attached Rule 56 statement of undisputed facts. (R56 Stmt.)

2

Tetley also kept employees informed about their benefits by issuing company-wide memoranda. For example, in 1991 Tetley sent a letter to all salaried employees reminding them of certain changes that were being made to retiree medical benefits. (App. 7; R56 Stmt. ¶¶ 34-36.) The letter explained that Tetley revised the service requirements and established other cost-sharing measures in an effort to contain the high cost of providing medical benefits to retired employees. (App. 7.) That letter, like the SPDs, also contained a provision explaining Tetley's right to discontinue any employee welfare benefits at any time. (Id.)

In 1994, Tetley assembled a team to study the company's benefits strategy. (R56 Stmt. ¶¶ 40-44.) The team was charged with the task of finding a way to maintain a high quality benefits package while reducing the ever increasing cost trends associated with providing a comprehensive welfare benefits plan. (Id.) The team sent a number of letters to Tetley's employees, updating them as to the team's progress. (Id. ¶ 42.) After meeting with outside consultants and focus groups composed of Tetley employees, the team recommended that Tetley self-fund its welfare benefits plan and contract with a managed care organization to administer the benefits to employees. This change in strategy was designed to improve the quality of available benefits and to reduce the cost of providing them. (Id. ¶¶ 41, 44.)

Based on the recommendation of the benefits strategy team, Tetley began to self-fund its medical benefits plan in 1995. Tetley contracted with United HealthCare ("UHC") to administer the plan ("UHC plan"). (Id. ¶¶ 45-51.) Although the shift to managed care involved some changes to their benefits, qualified Tetley retirees remained eligible to continue receiving medical benefits. (Id. ¶ 46.) Employees could also continue to elect coverage through a participating HMO instead of UHC. (Id. ¶ 45.)

From 1995 to 2001, Tetley issued two SPDs describing changes to the medical benefits available to Tetley employees and retirees. (App. 9-10.) These SPDs contained express reservation of rights provisions explaining Tetley's right to terminate or amend the welfare benefits available at any time. (R56 Stmt. ¶¶ 56, 58-59.) Neither of these SPDs contains language that could reasonably be interpreted as promising lifetime retiree medical benefits. (App. 9-10.)

As health care costs continued to rise, Tetley determined that it would no longer be able to provide retiree medical benefits to all of its employees. In March 2001, Tetley announced that it would restrict current employees' eligibility for retiree medical benefits. On March 15th, Tetley sent a letter to all active employees informing them that retiree medical benefits would no longer be available to employees retiring on or after January 1, 2002. (R56 Stmt. ¶ 60.) Although the availability of medical benefits to existing retirees was unaffected by this reduction, Tetley sent existing retirees a letter informing them of the change. (Id. ¶ 62.) Tetley told existing retirees that, while the company intended to continue to provide them with medical benefits, Tetley reserved the right to cancel those benefits at any time. (Id.)

Despite Tetley's cost control measures, the cost of providing quality medical benefits continued to soar. At a December 10, 2001 meeting of the board of directors of The Tetley Group Ltd., Tetley's then-parent company, the board considered a detailed report analyzing the viability of the current retiree medical benefits program. (Id. ¶ 63.) The report concluded that the cost of providing retiree medical benefits was too high for Tetley to sustain and that an affordable alternative plan would not provide any meaningful level of benefits. (Id. n.1.) Based on this analysis, the board of directors of The Tetley Group Ltd. made a recommendation to

Tetley regarding the retiree medical plan. (Id. ¶ 63.) Tetley's board of directors subsequently voted to terminate the medical benefits being provided to retirees effective June 1, 2002. (Id. ¶ 64.) Tetley informed current retirees of the decision by letter dated March 1, 2002. (Id. ¶ 65.) The letter explained the reasons why Tetley could not continue providing retiree medical benefits and offered assistance to those needing to find alternative sources of coverage. (Id. ¶¶ 66-68.) On June 1, 2002, Tetley terminated the medical benefits provided to retirees, including each of the plaintiffs in this case. This lawsuit followed.

## III.    LEGAL STANDARD

### A.    Summary Judgment Standard

The standard for summary judgment mirrors that of a directed verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). In either context, "the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id. Summary judgment is therefore proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Omega Eng'g, Inc. v. Eastman Kodak Co., 908 F. Supp. 1084, 1089 (D. Conn. 1995) (citing Fed. R. Civ. P. 56(c)).

Summary judgment is a judicial tool that aids the court in avoiding the delay and expense of trying claims for which a legally meritorious, factually indisputable defense exists. Id. at 1089. It serves to further the goal of the Federal Rules of Civil Procedure to "secure the just, speedy, and inexpensive determination of every action." Fed. R. Civ. P. 1. Indeed, summary judgment allows the court to dispose of meritless claims before the parties become entrenched in a frivolous and costly trial. Diamantopulos v. Brookside Corp., 683 F. Supp. 322, 325 (D. Conn.

1988) (citing Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 57-58 (2d Cir. 1987)).

Under Rule 56, the moving party has the burden to demonstrate the non-existence of a genuine issue of material fact. Omega Eng'g, Inc., 908 F. Supp. at 1090. The moving party may discharge this burden by demonstrating the absence of evidence to support the non-moving party's claims. Id. The burden then shifts to the non-moving party which must "by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). See also Anderson, 477 U.S. at 248; Fed. R. Civ. P. 56(e). Mere allegations or denials will not defeat a motion for summary judgment. Fed. R. Civ. P. 56(e).

Rule 56 "mandates the entry of summary judgment ... against the party who fails to make a showing sufficient to show the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. When evaluating the evidence, the court may rely upon its own view of the persuasiveness of the evidence and the plausibility of competing inferences. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). However, the court is not required to draw every conceivable inference from the facts; only reasonable inferences need be drawn. Parker v. Federal Nat'l Mortgage Ass'n, 741 F.2d 975, 980 (7th Cir. 1985).

**B.    Legal Standard Applicable to Contractual Vesting Claims**

Plaintiffs seek to enforce the terms of the retiree medical plan[2] pursuant to section 502(a)(1)(B) of ERISA. 29 U.S.C. § 1132(a)(1)(B) (providing a cause of action to recover

---

[2] Plaintiffs' complaint is based on rights alleged to exist pursuant to the provisions of Tetley's employee welfare benefit plan relating to the availability of medical benefits for retired employees. For ease of reference, this aspect

benefits due under the terms of a plan, to enforce rights under the terms of a plan, or to clarify rights to future benefits under the terms of a plan); (Compl. ¶¶ 29, 35, 43). Plaintiffs' section 502(a)(1)(B) claim is based entirely on the premise that they have a contractual right to retiree medical benefits and that Tetley breached its contractual obligation to provide those benefits when it terminated the retiree medical plan. (Compl. ¶¶ 29, 35, 43). See Kunkel v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 82 (2d Cir. 2001) (citing Strom v. Goldman, Sachs & Co., 202 F.3d 138, 142 (2d Cir. 1999).)

As a general rule, "ERISA does not create any substantive entitlement to employer-provided medical benefits or any other kind of welfare benefits." Id. Instead, "[e]mployers are generally free under ERISA, for any reason at any time, to adopt, modify or terminate welfare plans." Id. (quoting Curtis-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995); and citing Joyce v. Curtis-Wright Corp., 171 F.3d 130, 133 (2d Cir. 1999) (stating the general rule that under ERISA an employer-sponsored welfare plan is not vested and that an employer has the right to terminate or unilaterally amend the plan at any time).) Congress intended ERISA to provide employers with the flexibility to reduce or cancel welfare benefits in response "to unpredictable medical insurance needs and costs." McMunn v. Pirelli Tire, LLC, 161 F. Supp. 2d 97, 111 (D. Conn. 2001) (Arterton, U.S.D.J.).

Although welfare benefits such as retiree health insurance do not automatically vest, they may be found in certain limited circumstances to vest by contract. Abbruscato v. Empire Blue Cross & Blue Shield, 274 F.3d 90, 97 (2d Cir. 2001); Kunkel, 274 F.3d at 82; McCunn, 161 F.

---

of Tetley's employee welfare benefit plan will be referred to as the "retiree medical plan" or as "retiree medical benefits."

Supp. 2d at 111. Contractual vesting occurs when the employer promises the employee[3] a lifetime welfare benefit through specific, written language contained in a formal plan document. McCunn, 161 F. Supp. 2d at 111.

Fundamental to an understanding of the viability of a contractual vesting claim is that an employee cannot establish the existence of vesting merely by pointing to the absence of plan language imposing a durational limit on the benefit in question. In other words, the employer does not have the burden of identifying plan language that limits the duration of retiree medical benefits in order to obtain summary judgment. Joyce, 171 F.3d at 136. Instead, an employee must identify "specific written language that is reasonably susceptible to interpretation as a promise" of lifetime retiree medical benefits to avoid summary judgment. Abbruscato, 274 F.3d at 97 (quoting Joyce, 171 F.3d at 134.) This standard is raised to a more stringent level by the requirement that the employee must demonstrate that a written promise for benefits is found in the plan documents themselves. The law in the Second Circuit provides that "informal communications between an employer and plan beneficiaries cannot amend an ERISA plan absent a showing tantamount to proof of fraud." McCunn, 161 F. Supp. 2d at 111 (quoting Moore v. Metropolitan Life Ins. Co., 856 F.2d 488, 492 (2d Cir. 1988).) In fact, the employee is barred from introducing extrinsic evidence concerning the meaning of an ERISA plan unless the employee can demonstrate some ambiguity in the plan itself that requires reference to communications outside of the plan. Abbruscato, 274 F.3d at 98 (multiple citations omitted.) "This rule gives effect to ERISA's requirement that plans and SPDs be the primary means of

---

[3] For ease of reference, the term "employee" will be used to refer to a plan participant in either active employment or retirement status.

8

informing beneficiaries and participants of their and their employer's rights and obligations under the plans." McCunn, 161 F. Supp. 2d at 111.

Even if the employee clears the hurdle of identifying plan language that reasonably could be construed as promising lifetime welfare benefits, those benefits do not vest if the plan documents reserve the plan's right to cancel or amend the plan. The Second Circuit addressed the effect of a reservation of rights in the two companion cases Abbruscato and Kunkel.

In Abbruscato, plaintiffs included a group of retirees whose summary plan descriptions contained both a reservation of rights and language that was sufficiently ambiguous to permit an argument that it promised lifetime welfare benefits. 274 F.3d at 100. Despite the existence of such language, the Second Circuit held that:

> Because the same document that potentially provided the "lifetime" benefits also clearly informed employees that these benefits were subject to modification, we conclude that the language contained in the [relevant plan document] is not susceptible to an interpretation that promises vested lifetime life insurance benefits.

Id. at 99-100. The result was different in Kunkel, wherein the plaintiffs avoided summary judgment by showing that a plan document which was ambiguous as to vesting contained no reservation of rights. 274 F.3d at 84. Accordingly, the effect of Abbruscato and Kunkel is clear: a welfare benefit may not be deemed to have contractually vested if the same plan document that is arguably ambiguous as to vesting also contains a reservation of rights allowing amendment or termination of any aspect of the plan.

### C.    Legal Standard Applicable to Breach of Fiduciary Duty Claims

In addition to their breach of contract claim, plaintiffs allege that Tetley violated its fiduciary duty to plaintiffs by representing "that their retirement health insurance benefits would not be modified or terminated." (Compl. ¶ 56.) Although the fiduciary breach claim is

9

embodied in the complaint as a request for relief, Tetley is entitled to summary judgment on plaintiffs' breach of fiduciary duty claim as if it were set forth as a cause of action. (See id.)

Pursuant to section 404 of ERISA, a plan fiduciary must:

> Discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA].

29 U.S.C. § 1104(a). See e.g., Abbruscato, 274 F.3d at 102 (discussing the standard of proof for breach of fiduciary duty claims relating to the termination of retiree life insurance benefits). Stated more simply, a plan fiduciary has "a duty to deal fairly and honestly with its beneficiaries." Abbruscato, 274 F.3d at 102 (quoting Ballone v. Eastman Kodak Co., 109 F.3d 117, 124 (2d Cir. 1997).)

When reducing or eliminating benefits under a retiree medical plan, an employer must observe two distinct obligations toward employees. See Kunkel, 274 F.3d at 87-89. First, if the employer is acting as a plan fiduciary, it must at all times act in accordance with the terms of the plan. Id. at 87. 29 U.S.C. § 1104(a)(D). Under most circumstances, an employer that "amends an existing plan's design does not come within ERISA's definition of a fiduciary."[4] Kunkel, 274 F.3d at 88 (quoting Siskind v. Sperry Retirement Program, Unisys, 47 F.3d 498, 505 (2d Cir. 1995).) If a plan provides for vested retiree medical benefits, however, an employer's breach of

---

[4] ERISA provides that a person is a plan fiduciary to the extent that he or she "exercises any discretionary authority or discretionary control respecting management of the plan or has any discretionary authority or discretionary responsibility in the administration of the plan." Id. (quoting Varity Corp. v. Howe 516 U.S. 489, 498 (1996)). See 29 U.S.C. § 1002(21)(A).

10

the contractual duty to provide those benefits may, in turn, also violate the employer's fiduciary obligation toward the employees. Id.

The other way in which an employer can potentially violate a fiduciary duty toward employees is by assuring them that they would receive lifetime benefits without also disclosing the employer's right to terminate the plan. Id. at 88-89. The bar for establishing the existence of allegedly misleading statements made to employees is set high. The employee must do more than point to casual remarks or informal communications. A fiduciary breach claim requires proof of affirmative, systematic, and deliberate attempts to convince employees that their benefits would never be reduced or proof that an employer provided misleading information in response to a specific question regarding the duration of a retiree health benefit. Id. (noting that the employer violated its fiduciary duty to employees where defendant "affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life . . . "); Abbruscato, 274 F.3d at 103; McCunn, 161 F. Supp. 2d at 122, 124 (finding that an employer may violate its fiduciary obligation to employees by "consistently and deliberately foster[ing] the belief that benefits would be lifetime benefits . . . ."). Even under these circumstances, however, an employer cannot be found to have violated a fiduciary duty to employees if a clear reservation of rights to amend or terminate the plan has been communicated to them. McCunn, 161 F. Supp. 2d at 125 (noting that employees could reasonably conclude that they were entitled to lifetime benefits on the basis of verbal and other assurances only "[i]n the absence of a clear and communicated reservation of rights" disseminated to employees).

11

## IV.  ARGUMENT

### A.  Plaintiffs' Retiree Medical Benefits Did Not Vest

In this case, two questions must be answered to determine whether plaintiffs can establish a vested contractual right to retiree medical benefits: "what constitutes the relevant ERISA plan applicable to each plaintiff, and whether the terms of that plan provide for vested benefits." McCunn, 161 F. Supp. 2d at 112.  For ease of reference, the plan documents applicable to each plaintiff are set forth in Tetley's accompanying statement of undisputed facts.  (R56 Stmt. ¶¶ 69-89.)  As demonstrated below, the terms of those plans do not provide for vested retiree medical benefits for any of the plaintiffs.

#### 1.  The Plan Documents Do Not Promise Lifetime Benefits

Under the terms of the John Hancock policy, Tetley employees remained eligible to receive medical benefits after retirement.  (App. 1 at T00005-06 ("Employees who retire on or after the effective date of the Policy shall be eligible for all coverages they had prior to retirement except Accidental Death and Dismemberment Insurance").)  The UHC Plan uses similar language.  (App. 2 at T00398-99, T00448-50 ("Retired Employees are eligible for the benefits as described below after they stop being an Active Employee provided they meet the following eligibility requirements").)  Neither the John Hancock policy nor the UHC plan state or suggest that medical benefits vest upon retirement or will be provided for life.  Instead, these plan documents provide that retirees are generally eligible to receive benefits on the same terms as active employees so long as they continue to satisfy the eligibility criteria.  (App. 1 at T00005-06; App. 2 at T00398-99, T00448-50)

12

Like the John Hancock and UHC documents, the HMO plan documents describing health benefits available to plaintiffs Dubman and Fondaco do not promise lifetime retiree medical benefits. (Rule 56 Stmt. ¶¶ 69-81; App. 25-31.) To the contrary, Tetley's contracts with PHS and US Healthcare both contain provisions allowing Tetley to unilaterally cancel those contracts and the benefits provided thereunder. (Rule 56 Stmt. ¶¶ 75, 77, 81; App. 25 at T01035; App. 27 at T01079; App. 29 at T01186; App. 31 at T01260.) Similarly, the subscriber agreements issued by PHS clearly explain Tetley's right to terminate the employee's medical benefits at any time. (Id. ¶¶ 74, 78; App. 26 at T01053 ¶ 7; App.28 at T01126 ¶ A(2) & B(1); App. 30 at T01222 ¶ A(2) & B(1).)

In Joyce, the Second Circuit rejected contractual vesting claims based on language nearly identical to that used in the Tetley medical plan documents. 171 F.3d at 136. Plaintiffs in Joyce sought to escape summary judgment by pointing to SPD language purporting to create an ambiguity sufficient to be construed as a promise of lifetime retiree medical benefits:

> During your retirement, you and your covered dependents will have the same Basic Health Care coverage as you had while active at no cost to you.

Id. The Second Circuit rejected plaintiffs' argument. In upholding summary judgment for the employer, the Court observed that the purportedly ambiguous statement "appears to do no more than place retired workers in the shoes of active employees." Id. at 136 n.4. Similarly, the Tetley medical plan documents do no more than place the plaintiffs in the same position as active employees with respect to the availability of medical benefits. In any event, the Court further found that the SPD contained other language – namely a reservation of rights – "that sufficiently vitiates any potential ambiguity." Id. at 136.

13

Like the SPD in Joyce, the Tetley medical plan documents contain express reservation of rights provisions. (App. 1 at T00007, T00021; R56 Stmt. at ¶¶ 6-7.) The John Hancock policy expressly reserves in two separate sections Tetley's discretion to terminate the plan. (Id.) The section entitled "Discontinuance of Insurance to Employees" provides that coverage ends upon termination of that particular coverage or of the policy itself. (App. 1 at T00007.) The amendment, renewal and termination provision expressly reserves Tetley's right to "terminate this policy at any time . . . [without] the consent of or notice to any employee or beneficiary . . . ." (App. 1 at T00021.) The UHC plan also contains express termination provisions, (App. 2 at T00388(a) ¶ B(1)(a)&(c); T00420, 478; R56 Stmt. at ¶ 50), as do the HMO plan documents. (R56 Stmt. ¶¶ 74-78, 81.)

The reservation of rights provisions contained in the Tetley medical plan documents defeat plaintiffs' contractual vesting claim as a matter of law. Abbruscato, 274 F.3d at 99-100 (holding that "[b]ecause the same document that potentially provided the 'lifetime' benefits also clearly informed employees that these benefits were subject to modification, we conclude that the language contained in the [SPD] is not susceptible to an interpretation that promises vested lifetime life insurance benefits"). Thus, even if plaintiffs could identify some ambiguity in the language of the medical plan documents capable of being interpreted as a promise for lifetime retiree medical benefits, there is no contractual vesting of such benefits because of Tetley's explicit right to terminate those benefits at any time. As a matter of law, plaintiffs' retiree medical benefits cannot be considered to have vested. Id.; Sprague v. General Motors Corp., 133 F.3d 388, 401 (6th Cir. 1998) ("We see no ambiguity in a summary plan description that tells

14