**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **VEILA VEYONNE ADAMS,** | ) | |
| **ANTHONY L. CERRETA,** | ) | |
| **SALVATORE SAM DIBENEDETTO,** | ) | |
| **HOWARD DUBMAN,** | ) | |
| **PETER FONDACO,** | ) | |
| **GLORIA ANNETTE PEARSON JENKINS,** | ) | |
| **BARBARA ANNE JOHNSON,** | ) | |
| **JOSEPH A. LATTINI,** | ) | |
| **CRESSIE M. MAYES**, Individually and as | ) | |
| Representative of **HENRY FOSTER MAYES**, | ) | |
| and **ARTHUR J. SMITH** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | **CIVIL ACTION NO.** |
| | ) | **303 CV 649 (JBA)** |
| **v.** | ) | |
| | ) | |
| **TETLEY USA, INC.** | ) | |
| | ) | |
| **DEFENDANT.** | ) | **MAY 12, 2004** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

This case presents the issue of what level of candor and disclosure is required of

an employer before it may terminate retirees' health insurance benefits.  The Plaintiffs,

ten former and retired employees of Tetley USA (Tetley and its predecessor

organizations will be referred to herein as "Tetley") were, from time to time during their

employment with Tetley, promised health insurance coverage during their retirement, subject only to making a contribution towards the premium.  Plaintiffs had worked for Tetley, collectively, two hundred and one years before Tetley implemented a clear and unambiguous reservation of rights ("ROR") in 1985.  (App. 5 T00613).[1]  All Plaintiffs commenced working for Tetley when the health insurance policy provided that health benefits would be provided to retirees.  (App. 3 & App. T00501).

Effective June 1, 2002, Tetley unilaterally terminated all retiree health insurance benefits.  (App. 5 T00925).  As a result, Plaintiffs were forced to seek (if obtainable) substitute health insurance at a substantial increase in cost to each of them.

Plaintiffs' claims arise under the Employee Retirement Income Security Act of 1974, 29 U.S.C. Sec. 1001 et. seq. ("ERISA").

The Claimants have brought this action alleging breach of contract rights, promissory estoppel and/or breach of Tetley's ERISA fiduciary duties to the Plaintiffs.

Tetley has moved for Summary Judgment.  Plaintiffs object.

---

[1] In this case, Plaintiffs have previously submitted documents to Tetley which were then included in its Appendix.  References herein, unless otherwise specified, are to Tetley's Appendix.

## FACTUAL BACKGROUND:

All Plaintiffs commenced work for Tetley between 1950 and 1982.  They retired between 1991 and 1999.

Upon the commencement of Plaintiffs' employment with Tetley, employee insurance benefits were described in the obtuse language of an insurance booklet issued by the John Hancock Mutual Life Insurance Company ("Hancock").  (App. 1 and App. 3).  That booklet provided that health insurance benefits would continue for so long as one was a member of an eligible employee class which included "salaried retirees". (App. 3 T00501).  Nowhere in the Hancock booklet and the pre 1985 documents that were in effect when the Plaintiffs commenced working for Tetley, was there any clear and unambiguous reservation of rights ("ROR") for Tetley to terminate or cancel health benefits of retirees.  In fact, it was generally the understanding of Plaintiffs that Tetley would provide them with medical insurance upon their retirement.  (App. 20 T00839 and App. 21 T00855).

In the 1990's, Tetley offered Plaintiffs Adams, DiBenedetto, Dubman, Fondaco, Lattini and Smith the opportunity to retire early.  The offer was made by Tetley in order to downsize its operation and realize the attendant benefit of reduced employee costs.

The remaining Plaintiffs, Ceretta, Jenkins, Johnson and Mayes retired in the ordinary course.

In deciding whether to accept Tetley's offer of early retirement, Plaintiff Viola Adams tried to assure herself of the continuance of retirement medical coverage. She addressed inquiries to William Vazquez, Tetley's Benefit Administrator at the time. (App. 15 T00908). She was assured of her continued coverage in retirement subject only to making the required premium contribution. There was no qualification or reservation of rights by Tetley, in its exit letter, to discontinue the coverage. In the retirement letter received by Adams on May 23, 1991, (App. 15 T00910) and Tetley's subsequent letter dated June 19, 1991, (App. 15 T00914), the continuation of medical coverage was described as subject only to her payment of her monthly contribution.

Similarly, in 1994, Plaintiff DiBenedetto was offered a voluntary separation plan. One of the features of that plan, which attracted DiBenedetto, was the assurance of retiree health coverage. (App. 18 T00980).

DiBenedetto received two communications from Tetley describing the retiree health insurance benefits. (App. 18 T00980). In the first dated 12/16/94, the attachment stated: "medical coverage is continued provided you make the required employee contribution." (App. T00984). There was no other qualification. The only contingency

was "as was mentioned in the benefits strategy team update letter on Nov.

30th…management will do all they can do to provide for the benefits now, [but] in the

case of a sale there are no guarantees that the status quo will be maintained.  We cannot

be sure what the Tetley benefit program will be after a change in control".  However,

Tetley then communicated with DiBenedetto in a second letter of 1/20/95 which

Margaret Smith, Benefits Manager, stated:

> "As a retired employee you are eligible to continue your single
> medical coverage through John Hancock.  The monthly
> contribution of $23.08 (10% of the premium) will be deducted
> from your pension check.  This contribution is subject to change
> each January 1st based on changes in the annual John Hancock
> renewal premium.  Please indicate on the enclosed retiree
> election form if you wish to continue your medical coverage."

No qualification other than the obligation to pay monthly contribution was

contained in Smith's letter.

Plaintiff Fondaco, when he approached age 61, considered accepting Tetley's

early retirement package which was being offered because of the sale of the plant where

he worked.  An important reason for him in deciding to accept the early retirement

package was to obtain the Tetley retiree health insurance benefit which he relied upon

obtaining.  (App. 19 T00778-00779).  In fact, he had a conversation with Tetley's

President who recommended that he accept the Tetley package as he would be "taken

care of".  (App. 19 T00778).  Fondaco later received a letter dated 12/16/94 from Tetley (App. 19 T00780) with an attachment, in which his retiree medical insurance benefits were described.  That description contained no qualification other than the payment of premiums on his Tetley retiree medical insurance.  As with DiBenedetto, Fondaco had earlier received a letter mentioning the possibility of a change in control effecting his benefits.  However, in the final exit letter from Margaret Smith, there was no such reference and it set forth the benefits to which he would be entitled upon retirement, contingent upon payment of 10% of the premium.

Plaintiff Lattini retired from Tetley in 1990 at age 55.  Lattini was offered the opportunity to retire early and obtain a benefit package.  One of the factors in Lattini's decision to accept retirement was availability of retiree health insurance from Tetley (App. 22 T00810).  Lattini directed two inquiries to Tetley regarding the continuance of retiree health insurance.  He first wrote to Will Vazquez at Tetley on 2/21/90 inquiring as to a grandfather provision.  (App. 22 T00813).  He was then advised "regarding the medical benefits, as of July 1, 1991, you will be 55 years old with over 12 years of service, therefore you will be eligible for retiree medical benefits.  The amount that you will be required to pay will be determined under the new rates for retirees depending upon when you decide to retire between the ages of 55 and 62".  Again there was no

qualification other than the requirement that Lattini pay a share of the premium.

Thereafter, Lattini wrote to Tetley's Benefits Manager, Margaret Smith, who confirmed

"in accordance with your request, the following outlines the benefits to which you would

be entitled should you decide to retire on July 1, 1991: provided that you retire on July 1,

1991, Tetley will continue to pay 90% of the medical premium and you will pay 10%.  In

other words, your contribution under the medical plan insured through John Hancock will

be $37.50 a month for family coverage".  (App. 22 T00815).  Again, the only

qualification was payment by Lattini of his contribution of the premium.  Three years

later, Lattini requested reassurance that he and his wife would always be covered by

Hancock.  (App. 22 T00819).  In answering, Margaret Smith belatedly attempted to

reserve Tetley's rights.  On 2/16/94, Smith sent Lattini a letter stating "while I would like

to be able to give you an answer of assurance that your John Hancock coverage will

always be in effect, I cannot do so."  (App. 22 T00822).

    Plaintiff Smith retired from Tetley on 1/1/92.  In connection with his retirement,

Smith received a Tetley benefit outline (App. 24 T00877-00878) which set forth his

benefits.  Under medical and dental coverage it stated "medical is continued provided you

make the required employee contribution."  There was no other limit or qualification.  He

also received a letter from Tetley dated 10/31/91 (App. T00889) stating (emphasis added)

"In connection with your retirement from Tetley on 1/1/92, the following outlines the

benefits to which you are entitled as a retired employee.

> "Medical coverage
>
> As a retired employee, you are eligible to continue your family medical coverage with John Hancock.  As you know, John Hancock has determined that Kelly qualifies for handicapped status under our contract and such, she will be considered your dependent and eligible for medical coverage under the Tetley Plan.  The monthly contribution of $45.30 (rate effective January 1, 1992) will be deducted from your pension check.
>
> As you may recall, several changes to the retiree medical plan effective January 1, 1992, will have an impact on your medical benefits, namely, the deductible and out-of-pocket maximums.  Enclosed is a description sheet highlighting these changes.  In accordance with Hank McInerney's approval, you will not, however, be subject to the change regarding the increase in the percent of the employer premium that some retirees will be required to pay based on their age and years of service at retirement. You will continue to pay 10% of the premium that Tetley pays to John Hancock."

Smith's daughter, Kelly, had a serious medical condition which entailed significant

expense.  It was very important to Smith that Tetley provide medical coverage.  Relying

upon Tetley's promised coverage, Smith pursued a career as a consultant rather than

seeking a position with health benefits.  (App. 24 T00875).

Plaintiff Cerreta commenced his employment in 1950 with the Beech-Nut

Packing Company which in time purchased Tetley.  When Cerreta began to consider

retiring from Tetley, he addressed specific questions to representatives of Tetley to

confirm the status of his retiree health insurance benefits.  He received a note from

Margaret Smith of Tetley in answer to one of his inquiries (App. T00931) which stated

that if he retired before January 1, 1992, (emphasis added) "Contribution remains the

same for life (10% of Tetley premium)."  After 1/1/92, "contribution may change as

Tetley premium changes."  Smith wrote, "for life"; and, there was no qualification or

indication that Tetley could or would change the coverage.

On another occasion Cerreta had a conversation (App. 16 T00931) with the same

Margaret Smith regarding his retiree health insurance wherein he asked if he would need

to buy a supplemental health insurance policy and her answer was an unambiguous "no",

which to a reasonable person could only mean that Tetley would cover all of his

retirement health insurance needs.

Plaintiff Jenkins began working for Tetley in 1952.  She retired from Tetley in

1993 after 41 years.  When it came time for Jenkins to retire from Tetley in 1993, she

received a document from Tetley (App. 20 T00840) entitled TETLEY BENEFIT

OUTLINE RETIREMENT.  Under "benefits" it stated: "A. Medical and Dental

Coverage*****Medical is continued provided you make the required employee

contribution."  This language provided confirmation of Tetley's promise to provide

Jenkins with retiree health insurance.  There was no other qualification, such as was

provided in the case of the group life insurance or disability insurance, described in the same document.

In 1998, Jenkins received a letter dated January 23, 1998 (App. 20 T00844) which set forth her retirement benefits. That letter stated: "The following sets forth the benefits to which you are entitled.*****Medical Coverage. As a retired employee, you are eligible to continue your Family medical coverage through United Health Care. This coverage will be continued free of charge to you."

Plaintiff Johnson commenced her tenure as an employee of Tetley in 1950. She retired from Tetley in 1991 at the age of 60. Just prior to the time that Johnson retired from Tetley 1991, she received a letter from William Vazquez, Tetley's then Benefits Assistant (App. 21 T00855). That letter said: "In connection with your decision to retire on May 1, 1991, the following sets forth the benefits to which you are entitled upon retirement: ***** Medical Coverage As a retired employee, you are eligible to continue your family medical coverage. The monthly contribution of $37.50 will be deducted from your pension check. Please indicate on the attached Retiree Election/Waiver form if you wish to continue your medical coverage."

Plaintiff Mayes is the widow of Henry Foster Mayes ("Henry") and, as such, is covered as a dependent under the Tetley retiree health insurance benefits. Henry came to

work for Tetley in 1962, retired in 1993 (App. 23 T01012) and died on December 7,

2002.  When it came time for Henry to retire on February 1, 1993 he received a letter

(App. 23 T01015-T01017) dated January 19, 1993 from Margaret Smith, Tetley's

Benefits Manager which began:

"In connection with your retirement on February 1, 1993, the following sets forth the

benefits to which you are entitled:

*****

"<u>Medical Coverage</u>

As a retired employee, you are eligible to continue your employee plus one dependent

medical coverage through John Hancock.  The monthly contribution of $40.85 will be

deducted from your pension check.  This amount is subject change each year based on

changes in the premium.  Please indicate on the enclosed Retiree Election /Waiver of

Medical & Life Group Insurance form if you wish to continue your medical coverage."

There was no qualification or warning other than the fact that the premium may

change.  This was a re-affirmation of what Henry rightfully believed he had since 1962.

Interestingly enough on June 4, 1993, several months after Henry retired,

Margaret Smith, in response to Henry's request, sent him an Employee Handbook, which

contained a reservation of rights.

Plaintiff Dubman came to work at Tetley in 1981.  In June of 1995, Dubman was vying for the position of Chief Financial Officer of Tetley.  He did not get the position, which went to one of his peers, and Dubman was disappointed (App. 17 T00758).

Dubman then considered leaving Tetley.  However, at the time he was 3 years away from age 55 at which time he would qualify for Tetley's retiree medical program which provided lifetime retiree medical insurance (App. 17 T00758-59).  Dubman continued his employment with Tetley, reporting to the new chief financial officer.  (App. 17 T00758).

In 1998, Dubman was called into a meeting with John Pettrizzo, CEO & VP of Finance and Dick Rogers, VP of Tetley Human Resources where he was offered a position with Tetley in Palisades Park, New Jersey.  Dubman then lived in Stamford, Connecticut, and the offered job was a lower level position; however Dubman was told by Messrs. Pettrizzo and Rogers, that if he accepted the position, he would be guaranteed employment by Tetley until age 55, when he would then be eligible for retirement.  He asked if he would he receive lifetime medical benefits insurance if he retired at 55 and they said "yes".  Because of his wife's medical condition (she suffered from depression), medical insurance was always of significant importance to him and was something he

always kept in the forefront of his mind.  (App. 17 T00758-59).  If he accepted this new

Tetley proposal, he could "nail down" his retiree medical insurance.

Because of the assurance regarding future medical insurance, Dubman accepted

Tetley's offer and went to work in New Jersey.  Dubman accepted Tetley's offer and

accepted early retirement in 1999.  (App. 17 T00759).

In a letter dated July 12, 1999 (App. 17 T00760-65) setting forth the terms of

Dubman's severance, Tetley referred to an attached Benefit Outline at Retirement which

"…details your benefit entitlements."  The Benefit Outline stated: "Your cost for retiree

medical is 50% of the insurance carrier's premium.  Currently, this equals $349.37 per

month based on your current level of coverage.  The amount of the carrier's premium

changes each January 1 and your cost, therefore, will change as well.  You will be

contacted each year of the revised cost to continue your retiree medical coverage.  Your

monthly contribution will be deducted from your severance check.  At the end of your

severance (January 14, 2000) you will be required to mail us a check each month to cover

the cost of your continued medical coverage."

There was no qualification on the medical coverage other than the requirement

that Dubman pay his share of the premium. In the letter from Richard Rogers, Vice

President-Human Resources, Dubman was requested to sign his copy of the foregoing

severance agreement and acknowledge his agreement thereto.  (App. 17 T00762).  That agreement, contained no reference to any reservation of rights or potential termination of health insurance benefits.

After Dubman had made his decision to retire based upon what he had been told by Tetley, he received a subsequent letter from Margaret Smith of Tetley (T00765-767). That letter contained a reservation of rights, however, it did not request that Dubman acknowledge or agree to that belated provision.  It only requested that he sign a retiree election form which he did sign and return.  (App. 17 T00768).  Dubman never agreed to nor did he sign the letter from Smith in which she unilaterally inserted "please be advised that Tetley reserves the right to change and/or terminate the Tetley, USA, Inc. retiree medical benefit plan at any time."  Such a provision was not included in the executed agreement between Dubman and Rogers.  This belated notice from Smith, in 1999, regarding Tetley's reservation of the right to terminate retiree medical coverage was the first time that such language was included in any of the Plaintiffs' exit documents.  No such language was provided to any of the other Plaintiffs when they retired.

## II.  ARGUMENT

A.  WHEN ALL PLAINTIFFS COMMENCED EMPLOYMENT WITH TETLEY, THE
PLAN DOCUMENTS PROVIDED FOR RETIREE HEALTH BENEFITS
WITHOUT AN UNAMBIGUOUS RESERVATION OF RIGHTS

Upon the commencement of Plaintiffs' employment with Tetley, employee

insurance benefits were described in the obtuse language of an insurance booklet issued

by the John Hancock Mutual Life Insurance Company ("Hancock").  (App. 1 and App.

3).  That booklet provided that health insurance benefits would continue for so long as

one was a member of an eligible employee class which included "salaried retirees".

(App. 3 T00501).  Nowhere in the Hancock booklet and the pre 1985 documents that

were in effect when the Plaintiffs commenced working for Tetley, was there any clear

and unambiguous reservation of rights for Tetley to terminate or cancel health benefits of

retirees.  In fact, it was generally the understanding of Plaintiffs that Tetley would

provide them with medical insurance upon their retirement.  (App. 20 T00839 and App.

21 T00855).

The Hancock materials placed limits on the life insurance benefit at age 65 and on

the accidental death and dismemberment at age 70, but placed no such limits on the

health insurance benefits.  (App. 3 T00501-502).  In Abbruscato v. Empire Blue Cross

and Blue Shield, 274 F.3d 90 (2d Cir., 2001) at 97-98, the Court indicated that the

disparate treatment used in describing different types of insurance benefits (a limitation as to one and not the other) was a factor to be considered in determining whether or not there was an unambiguous reservation of rights.

Also, the Hancock materials provided for an integration of Medicare benefits, which is an indication that the Hancock medical insurance would be applicable to retirees. (App. 3 T00519). Tetley's first effective reservation of rights came in 1985. (App. 5 T006611). For the first time, Tetley stated "the company intends to continue each of the plans indefinitely, but necessarily reserve the right to change or discontinue them at any time."

This reservation of rights was too late and was ineffectual as to Plaintiffs, who had all joined Tetley prior to that time, with an understanding that they would be entitled to retirement health benefits. They had worked for Tetley in reliance upon receiving such benefits. In Devlin v. Empire Blue Cross, the Court, under similar circumstances, noted

> "Therefore, Empire's reliance upon its 1987 SPD, 'your Handbook', for its reservation of right to modify the life insurance benefits was unavailing. We reject Empire's argument because after the Plaintiffs began performance, pursuant to the pre-1987 SPD's, Empire was not free to revoke." Devlin v. Empire Blue Cross & Blue Shield, 374 F.3d 76 at 84, 85 (2d Cir. 2001).

Further, it should be noted that Plaintiffs Adams, Ceretta, DiBenedetto, Jenkins, Johnson and Mayes had all commenced working, prior to the passage of ERISA.

Because ERISA is presumed to "afford [no] less protection to employees and their beneficiaries then they enjoyed before ERISA was enacted" <u>Firestone Tire & Rubber Co. v. Bruch</u>, 49 U.S. 101, 113-114 (1989), the statute should not be interpreted to authorize a result that is harsher than those principles would authorize.

> "Actions challenging an employer's denial of benefits before the enactment of ERISA were governed by principles of contract law… if the plan did not give the employer administrator discretionary or final authority to construe certain terms the Courts reviewed the employee's claim as it would have any other contract claim by looking to the terms of the plan and other manifestations of the parties intent." <u>Firestone</u> <u>supra</u> at 112-113.

Tetley tries to create a pre 1975 reservation of right by pointing to various provisions in the Hancock booklet wherein the policy provided, for instance, that it could be cancelled for non-payment.  The provisions which permit cancellation for non-payment, as between Hancock and Tetley, are not binding upon or applicable to Tetley's obligation to its employees to provide what it had promised.  The Hancock policy was the means by which Tetley was satisfying its obligations, at the time, to Plaintiffs.  "An employer cannot reach out to insurance policies or an insurance certificate to amplify or explain away an SPD "<u>Heidgerd v. Olin Corp.</u>, 906 F. 2d 903 (2d Cir. 1990 at 908).

## B.  EXIT DOCUMENTS AND EARLY RETIREMENT

All Plaintiffs, upon retirement, received exit documents which set forth their entitlement to retirement health insurance coverage, subject only to their paying premium contributions.  There was no statement of ROR.  If Tetley was of a mind to reserve its rights vis-à-vis early retirees; it knew how to say it.  In the retirement letters issued in 2000 to employees James Price and Dorothy A. Young (Plaintiffs' Appendix 33 and 34) (see Letters Ex. dated March 29, 2000 and April 12, 2000), Tetley stated: " Please be advised that Tetley reserves the right to change, amend or terminate the Tetley USA Inc. Retiree Medical Plan at any time."  No such language was presented to the Plaintiffs.

A plan sponsor can easily take steps to avoid misleading employees by specifying clear and specific benefits through a careful drafting of plan documents. For this same underlying reason, contract law generally endorses the principal that ambiguities are be interpreted against the drafter.  <u>Restatement</u> <u>of</u> <u>Contracts</u> 2d (1979) Sec. 206. "In choosing among the reasonable meaning of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds." <u>Restatement</u> <u>of</u> <u>Contracts</u> (2d), Section 206.

"Our conclusion draws support from other quarters as well.  In contracts of insurance generally, ambiguities are resolved against the drafter.  *See, e.g., City of Rose*

*City v. Nutmeg Ins. Co.*, 931 F.2d 13, 15 (5th Cir. 1991).  The same rule should apply here; the ambiguity in the summary plan description must be resolved in favor of the employee and made binding against the drafter.  Any burden of uncertainty created by careless or inaccurate drafting of the summary must be place on those who do the drafting, and who are the most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.  Accuracy is not a lot to ask.  And it is especially not a lot to ask in return for the protection afforded by ERISA's preemption of state law causes of action-causes of action which threaten considerably greater liability than that allowed by ERISA." Hansen v. Continental Ins. Co. 940 F. 2d 971 (5th Cir. 1991) at 982.

The common thread which permeates Tetley's negotiations with all of the early retirees, is that in the exit documents which memorialized their agreement, Tetley specifically failed to reference any reservation of rights.  Rather, in some situations, it belatedly attempted to notify Plaintiffs, after they had already retired (see Lattini letter of 2/16/94, T00822 and Dubman letter sent after he had already entered into an agreement through Vice President Rogers, which did not provide for any limitation on health benefits).  As the Court noted in Rucker v. Pacific FM, Inc. 806 F.Supp. 1453 at 1458, fn. 8.

> "the purpose of ERISA notification requirements is to protect the interests of a plan participant. Blau, 748 F.2d at 1352.  This goal is undermined for employers, such as Pacific FM, play 'hide the ball' with its employees.  The burden is not on Plaintiffs to ask what coverage has been eliminated; that responsibility lies with defendants."

Similarly, in Abbruscato, supra, the Court recognized that where the plan documents were ambiguous, extrinsic evidence could be introduced by the parties. As applicable here, Tetley's early pre-85 documents did not include a clear and unambiguous ROR. While an ROR was included in the '85 and '89 plan documents, Tetley failed to reference same in the exit documents, thus clearly creating confusion in the minds of the Plaintiffs as to its intentions regarding the continuation of health benefits. If Tetley intended an ROR on the health benefits, it could clearly have communicated it, as it later did commencing in 2000 (see Plaintiffs' App. Exhibits 33 and 34, letters to Price and Young attached hereto, and in some of the "after the fact" letters sent to some of the Plaintiffs).

### C. PROMISSORY ESTOPPEL

Principles of promissory estoppel also require that Tetley provide health insurance benefits to retirees: Adams, DiBenedetto, Dubman, Fondaco, Lattini and Smith. As noted above, each of the foregoing Plaintiffs retired from Tetley with the belief that they were being provided retiree health insurance benefits in exchange for accepting early retirement. As the Court noted in Devlin v. Empire Blue Cross, 274 F.3d 76 (2d Cir. 2001):

> "Principles of estoppel can apply in ERISA cases under extraordinary circumstances.". . .

> A Plaintiff must satisfy four elements to succeed on a claim of promissory estoppel "(1) A promise, (2) a reliance on the promise, (3) injury caused by the reliance and (4) an injustice if the promise is not enforced."  Aramony v. United Way Replacement Benefit Plan, 191 F.3d. 140, 151 (2d. Cir. 1999) quoting Schonholz, 87 F.3d at 79).  Additionally, "an ERISA Plaintiff must adduce not only facts sufficient to support the four basic elements of promissory estoppel but facts sufficient to [satisfy an] extraordinary circumstances" requirement as well. Aramony, 191 F3d at 151, quoting Devlin v. Transp. Comms. Int.'l Union, 173 F3d 94, 102 (2d Cir. 1999).  Schonholz provides an example of such an extraordinary circumstance where the employee was promised severance benefits to induce the Plaintiff to retire.  Schonholz, 87 F.3d at 79-80.

> Devlin, supra at 86.

Plaintiffs Adams, DiBenedetto, Dubman, Fondaco, Lattini and Smith satisfy the essential elements of promissory estoppel: it was their understanding that Tetley had promised lifetime medical benefits; they relied on that promise by accepting early retirement.  (Or, as in the case of Howard Dubman, taking and remaining in a position in New Jersey).  They suffered injury in that when Tetley cancelled insurance, they were left without coverage and were forced, at that late date, to seek more expensive coverage and,  there is an injustice in that if the promise is not enforced, they will suffer significant financial hardship as a result of Tetley's renegging on its promise, depriving them of the benefit that was promised.

The use of the promise of retiree health insurance benefits as an inducement to accept to early retirement, constitutes such extraordinary circumstances <u>Devlin</u> <u>supra</u> at 86.

### D.  BREACH OF FIDUCIARY DUTY

In <u>Varity Corp. v. Howe</u>, 516 U.S. 489 (1996) at 506, 507, the Supreme Court held that "affirmative misrepresentations about plan benefits may constitute a breach of fiduciary duty under ERISA".  As indicated in <u>James v. Pirelli Armstrong Tire Corp.</u>, 305 F.2d (6th Cir. 2002) 439 at 450, "…conveying information about the likely future of plan benefits [is] a discretionary act of administration" giving rise to a fiduciary duty."  The James Court stated, citing <u>Unisys</u>, 57 F.3d 1255.

"…the reservation of rights did not protect an employer from liability for breach of fiduciary duty 'where a company has deliberately fostered the belief that retirement benefits are lifetime benefits, and is aware that its employees incorrectly – if understandably – believes that their medical benefits will continue unchanged for the duration of their retirement".  <u>James</u> <u>supra</u> at 454.

The <u>James</u> Court further noted that an employer or a plan administrator fails to discharge its fiduciary duty to act solely in the interests of the plan participants and beneficiaries when it provides, on its "own initiative", materially false or inaccurate

information for employees about the future benefits of their plan. The Second Circuit, in Devlin, supra at 87-89 provided an extensive discussion of the current status of law on ERISA fiduciary duties. It concluded at 89: "On remand, the district court should permit a trier of fact to evaluate Empire's communication with Plaintiffs for affirmative misrepresentations regarding plan benefits and for failure to provide completely accurate plan information. A trier of fact could find that there is a fiduciary duty and that Empire breached it."

        As applicable in the instant case, the following Plaintiffs made specific inquiry as to the terms of retiree health benefits: Adams, Ceretta, DiBenedetto, Dubman, Smith and Lattini. Smith at no time, when inquiries were made regarding the continuation of retiree health insurance benefits with Tetley did Tetley affirmatively advise and/or remind those Plaintiffs that it was going to retain the right to later terminate their health insurance benefits. Similarly, the remaining Plaintiffs Cerreta , Mayes, Jenkins and Johnson in their exit letters, were not disabused of their reasonably founded belief that health benefits would continue through retirement. All of the Plaintiffs whether through accepting early retirement or, continuing to work for Tetley without obtaining alternative health coverage, relied upon this misrepresentation or material omission of fact perpetrated by Tetley.

It is Plaintiffs' position that in failing to include a clear reservation of rights in its communication with Plaintiffs or when inquiries were made, Tetley breached its ERISA fiduciary obligation of candor and fair dealing.  Tetley, was under a duty to communicate to the Plaintiffs all material facts in connection with the transaction which included a clear reminder, of its intention to retain the right to terminate retiree health insurance benefits.  See Restatement of Trusts, Section 170.  See also Gregg v. Transportation Workers of America, Internationl, 343 F.3d. 833 at 847 where the Court noted that the fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance, even if that requires conveying information about which the beneficiary did not specifically inquire citing Krohn v. Huron Memorial Hospital, 173 F.3d at 542 at 547.

E.  PLAINTIFFS' AFFIDAVITS RAISE MATERIAL ISSUES OF FACT AS TO WHETHER OR NOT THEY ARE ENTITLED TO RETIREE HEALTH INSURANCE BENEFITS.

As noted above, Plaintiffs claim that they are entitled to retiree health insurance benefits based upon contract rights, promissory estoppel and Tetley's breach of its ERISA fiduciary duties.  All Plaintiffs received exit letters in which Tetley failed to include any reservation of rights to amend or eliminate the retiree medical coverage. Ambiguity exists between the early SPD's which were in effect at the commencement of

all Plaintiffs' employment (the pre 1985 John Hancock policies) and the post 1985 SPD's which ultimately included a clear reservation of the right to terminate the right of retiree insurance.  The early Hancock policy provided that with respect to health insurance, it would continue for retired employees.  Given that ambiguity between the various SPD's, the Court should allow extrinsic evidence concerning that issue.  Abbruscato supra at 98.  In that vein, Tetley's failure, in its exit letters, which all Plaintiffs received and relied upon, to specifically reserve its right to terminate retiree benefits, represents material evidence of the parties agreement that retiree benefits would continue.  Tetley's disparate method of communicating with the Plaintiffs with respect to the retirement health insurance benefits creates a material issue of fact as to the terms of the contract between Tetley and the Plaintiffs and the intention of the parties to those contracts.

With respect to Plaintiff Dubman, his letter from Rogers requested that he specifically agree to and accept the terms and conditions of his severance package, which he did.  The subsequent letter from Margaret C. Smith, Benefits Manager, which did reference the reservation of rights to change, amend or terminate the Tetley plan, was sent unilaterally after the July 12th severance agreement.  The only document that Smith requested that Dubman sign was the retiree election of medical life insurance coverage which described the same benefits contained in the Rogers letter and, does not reference

any right to terminate the benefit.  The remaining nine Plaintiffs relied on their exit letters
as confirmation of what Tetley had led them to believe, that they would have lifetime
retiree medical benefits, benefits subject only to their paying their share of the premium.
As the Court noted in Perreca v. Gluck, 295 F.3d. 215 (2d. Cir. 2002) at 224 where
contractual language is ambiguous and subject to varying reasonable interpretations,
intent becomes an issue of fact and Summary Judgment is inappropriate citing Thompson
v. Gjivoje, 896 F.2d 712, 721 (2d Cir. 1990).

A material issue is also presented as to the six early retirees.  Based upon the
Affidavits of Adams, DiBenedetto, Dubman, Fondaco, Lattini and Smith, they relied
upon the promise of medical insurance in deciding to accept Tetley's early retirement.
Based upon that reliance, there is material issue as to whether or not, under the theory of
promissory estoppel, Tetley is bound to provide the early retirees continuing medical
coverage.  Finally, Tetley's failure to include a notice to the retirees of its intention to
retain its right to terminate benefits, in the exit letters, and making other statements and
answering inquiries that medical insurance would continue through retirement, raise a
material issue of fact as to whether or not Tetley breached its fiduciary duty of fair
dealing to the Plaintiffs.