UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Veila Veyonne Adams, et al.    :
          Plaintiffs,          :
                               :
v.                             :     Civil No. 3:03cv649(JBA)
                               :
Tetley USA, Inc.               :
          Defendants.          :

### RULING ON DEFENDANT'S MOTION
### FOR SUMMARY JUDGMENT [DOC. #21]

Plaintiffs are nine retirees and one widow of a retiree from Tetley USA, Inc., who assert three claims against Tetley stemming from the company's decision to terminate its retiree medical benefits plan as of June 1, 2002:  violation of Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B); breach of fiduciary duty; and promissory estoppel.  Plaintiffs seek declaratory and injunctive relief as well as money damages.  Tetley has moved for summary judgment on all claims, and oral argument was heard on March 7, 2005.  For the reasons that follow, the defendant's motion for summary judgment will be granted.

**I.    FACTUAL BACKGROUND**

**A.    The Plan Documents**

Tetley USA, Inc., was incorporated in 1972.  App. 3 at T00497.[1]  On October 1, 1975, Tetley entered an agreement with

---

[1]Citations are to Tetley's Appendix of Exhibits [doc. #26], which also has been adopted by Plaintiffs.  See Plaintiffs' Local Rule 56(a)(2) statement [doc. #31].

John Hancock, Policy Number 42438-GTC, to provide various insurance benefits to Tetley's employees. App. 1. The policy specifies benefits for those currently employed at Tetley. Concerning departing employees, the policy provides:

> Employment for insurance purposes terminates on the date the employee ceases active work with his Participating Employer, except that, in the circumstances specified below, employment shall be deemed to continue for insurance purposes, for the coverages specified below, until the earlier of (a) the expiration of the period specified below, or (b) the date the employee's Participating Employer, acting in accordance with rules which preclude individual selection, terminates the employee's employment for insurance purposes, by written notice to the employee, or by written notice to the insurer, or by any other means.

| While employee is absent from work due to | Employment may be deemed to continue for this Period | For These Coverages |
|---|---|---|
| . . . | . . . | . . . |
| Retirement | Indefinite | All coverages except Accidental Death & Dismemberment Insurance. |

App. 1 at T00017. The policy further provides that "[t]he Policyholder [Tetley] may terminate this policy at any time by giving written notice of termination to the Insurer" with 31 days notice, and "no amendment, renewal or termination of this policy shall require the consent of or notice to any employee or beneficiary or other person having a beneficial interest herein." Id. at T00021.

A summary plan document (SPD) in effect between 1975 and 1982 largely echoes the above policy, providing that "You shall cease to be insured under all coverages on the earliest of the

2

following dates: (1) the date of termination of your employment
(see paragraph below)... . "  The next paragraph differs from the
plan, however.  It states that employment terminates when the
employee ceases work, except for "Retirement, Life Insurance only
-- indefinitely."  App. 3 at T00514 (emphasis added).  A
subsequent SPD in effect between 1982 and 1985 revises the
provision in accordance with the contract between Tetley and John
Hancock to state that employment ceases when the employee ceases
work, except "Retirement, all coverages except Accidental Death
and Dismemberment Insurance -- indefinitely."  App. 4 at T00571.

Neither of the first two SPDs contains any express
reservation of rights by Tetley.  A reservation of rights first
appeared in the 1985 SPD entitled "Tetley Inc. Salaried Employees
Benefit Program," which states in an introductory section that
the "Company intends to continue each of the Plans indefinitely,
but must necessarily reserve the right to change or discontinue
them at any time."  App. 5 at T00613.  In the section concerning
health insurance, another reservation of rights appears: "Tetley
Inc. hopes and expects to continue the Plan indefinitely, but
reserves the right to change or terminate it if necessary."  Id.
at T00627.

In 1989, Tetley reviewed its employee benefits plans and
selected a managed care organization, United HealthCare (UHC) to
administer its health plan in place of John Hancock.  App. 2.

3

This plan provides:

> Retired Employee coverage ends on the earliest of the
> following:
> • <u>The date you stop being an eligible Retired Employee as
> determined by the Employer</u>.
> • The last day of a period for which contributions for
> the cost of coverage have been made, if the contributions
> for the next period are not made when due.
> • Effective for retirements beginning January 1, 1999,
> the date on which you reach Medicare eligibility.
> • <u>The date on which this Plan ends</u>.

App. 2 at T00420 (emphasis added).  The SPD in effect between

January 1, 1990 and December 31, 1992 contains a similar

reservation of rights to that of the 1985 SPD: "Plan Termination

Provisions: The company expects and intends to continue the plans

in your benefit program indefinitely but reserves its right to

end each of the plans without notice, if necessary.  The company

also reserves its right to amend each of the plans at any time

without notice."  App. 6 at T00697.  The plaintiffs confirmed at

oral argument that the reservations of rights language in the

SPDs in effect after 1985 was clear and unambiguous.  <u>See</u> App. 8

at T00711 (January 1, 1993 - June 30, 1995), App. 9 at T00717

(July 1, 1995 - December 31, 1998), App. 10 at T00722 (January 1,

1999 - 2001).[2]

---

[2]Plaintiffs also concede in their brief that "Tetley's first
effective reservation of rights came in 1985," Pl. Mem. in Opp.
to Def. Mot. for SJ [doc. #30] at 16, that "an ROR was included
in the '85 and '89 plan documents...," <u>id</u>. at 20, and that "the
post 1985 SPD's... included a clear reservation of the right to
terminate the right of retiree insurance," <u>id</u>. at 25.

Despite the switch to managed care, health benefits costs for Tetley continued to rise, and in March 2001, it informed its active employees that retiree medical benefits would no longer be available to those retiring on or after January 1, 2002.  App. 13.  Those who already had retired from Tetley were mailed a letter stating that the change in retiree medical benefits would not affect them, although "Tetley reserves the right to make any type of change to, or end, any plan, program, or contribution at any time."  App. 14.  Within a year, on March 1, 2002, Tetley did just that.  It sent a letter to Tetley retirees or their survivors stating that their medical benefits plan would be eliminated as of June 1, 2002.  <u>See</u>, <u>e.g.</u>, App. 15 at T00925.  It explained that the reason for its decision "is not complex - medical care in the US is costly and this cost is accelerating at an alarming rate."  <u>Id.</u>

**B.   The Individual Plaintiffs**

**1.   Regular Retirees**

Four plaintiffs, Cerreta, Jenkins, Johnson, and Lattini, retired in the regular course of their careers.  They were offered no early retirement or other incentive programs. Defendants argue that therefore these plaintiffs' claims are governed solely by the plan documents in effect when they retired.  These four plaintiffs, in contrast, argue that Tetley was not free to change their retiree health plan once they

5

started working for the company and thus their claims are
governed by the 1975 John Hancock policy documents in effect when
they started working for Tetley.

Plaintiff Cerreta retired from Tetley in the normal course
in March 1992, at age 66.  Cerreta Aff. ¶ 2, App. 16 at T00931.
Plaintiff Jenkins retired in February 1998 at age 65; she had
been receiving long term disability benefits since 1993.  App. 22
at T00840-45.  Plaintiff Johnson retired in 1991 at age 60, after
41 years of service to Tetley and its predecessor companies.
Johnson Aff. ¶ 2, App. 21 at T00855. Plaintiff Lattini retired in
July 1991 at age 55, after 13 years of service to Tetley.
Lattini Aff. ¶ 2, App. 22 at T00810.

All regular retirement plaintiffs were informed in letters
from the Tetley benefits manager that they would be eligible to
receive retiree health benefits provided they continued to pay
the required premium contributions.  None of the letters
contained a reservation of rights.  See App. 16 at T00935, App.
20 at T00840, App. 22 at T00857, App. 23 at T01012.

In addition, Cerreta and Lattini[3] allege that in
conversations and other informal communications, various Tetley
representatives told them that they were entitled to continuing

---

[3]Johnson and Jenkins, who also retired in the regular
course, allege no communications with Tetley other than letters
outlining their benefits.  See Jenkins Aff., App. 20 at T00839;
Johnson Aff., App. 21 at T00855.

benefits.  Cerreta states that prior to deciding to retire from
Tetley, he inquired of Margaret Smith, Tetley's Benefits Manager,
concerning his health benefits.  He received a note in return
stating that if he retired "before 1/1/92 ... contribution
remains the <u>same</u>, for life (10% of Tetley premium).  After 1/1/92
... contribution may change as Tetley premium changes."  App. 16
at T00933 (emphasis in original).  Cerreta further states that he
had "another conversation with Margaret Smith regarding retiree
health insurance where [he] specifically asked if [he] would have
to buy a supplemental policy.  Her answer was a clear and
unambiguous 'no.'  To me that meant I would be covered by
Tetley."  Cerreta Aff., App. 16 at T00931, ¶ 5.  Cerreta retired
on March 1, 1992.  App. 16 at T00934.  Plaintiff Lattini states
that before he retired he inquired twice of Tetley regarding
retiree health benefits.  In response to one inquiry, he received
a memo from Will Vazquez, which stated he would be "eligible for
retiree medical benefits."  App. 22 at T00814.  In response to a
second inquiry, Margaret Smith sent Lattini a memo stating,
"[p]rovided you retire on July 1, 1991, Tetley will continue to
pay 90% of the medical premium and you will pay 10%."  <u>Id.</u> at
T00815.  Neither memo contained a reservation of rights.

The regular retirement plaintiffs do not claim that they did
not receive the SPDs issued in and after 1985, all of which
contain reservations of Tetley's right to terminate the retiree

7

health benefit plan.  <u>See</u> <u>supra</u>.  They also do not claim that any
Tetley representative actually promised them "lifetime" benefits
in so many words.

### 2.  Early Retirement Plaintiffs

Six plaintiffs retired early under special incentive plans:
Adams, Dubman, DiBenedetto, Fondaco, Mayes, and Smith.  Dubman
and Smith negotiated individual early retirement contracts; the
others appear to have accepted early retirement package offers.

Plaintiff Adams retired on July 1, 1991, after approximately
29 years of service to Tetley (and ten additional years of
service to one of Tetley's predecessor companies).  Adams Aff. ¶
2, App. 15 at T00908.  She states that she accepted an offer of
"early retirement" at the age of 62, and that she relied on
Tetley's retiree medical insurance "in deciding to accept the
Tetley early retirement offer."  <u>Id.</u> At ¶ 3, 7.  Although Adams'
personnel file does not contain documentation that she accepted a
special early retirement plan, <u>see</u> App. 15, her status as an
early retiree is not disputed by defendant for purposes of this
motion.

Dubman began employment with Tetley in 1981 and continued
until July 1999, when he accepted early retirement at age 55.
Dubman Aff. ¶ 2, App. 17 at T00758.  In June 1995 he had hoped to
be appointed Chief Financial Officer, but a colleague was awarded
the position.  <u>Id.</u> at ¶ 3.  He considered leaving Tetley at that

point, but decided to wait four years, until he turned 55, when he would be eligible for the early retirement program. Id. at ¶ 4. Dubman's relationship with the new CFO, who became his boss, was "uncomfortable." Id. at ¶ 5. In 1998, Dubman states that he

> was called into a meeting with John Pettrizo, CFO and VP of Finance, and Dick Rogers, VP of Human Resources where I was offered a position with Tetley in ... New Jersey. ... It was a lower level position; however I was told by Mr. Pettrizo and Mr. Rogers that if I accepted the position, I would be guaranteed employment by Tetley until I was 55, when I would then be eligible for retirement. I asked if I retired at 55 would I receive lifetime medical benefits and they said 'yes.' Because of my wife's medical condition, medical insurance was always of significant importance to me and was something I always kept in the forefront of my mind. Because of the assurance regarding future medical insurance, I accepted Tetley's offer and went to work in New Jersey.

Id. at ¶ 6-7.

Dubman continued working for about one more year. Then Dubman and Tetley exchanged a series of letters negotiating his severance agreement. On July 12, 1999, Rogers sent Dubman a final letter outlining the details of the early retirement package and stating that he "will be eligible for participation in the retired employees' Medical and Life Insurance Plans... . The attached Benefit Outline at Retirement details your benefit entitlements." App. 17 at T00760. Attached to the letter was the outline, which provided:

> Medical and Dental Coverage
>      - Medical coverage is continued to the age at which you and your spouse, separately, are eligible for Medicare (currently, age 65)...
>      - Your cost for retiree medical is 50% of the

insurance carrier's premium.  Currently, this equals $349.37 per month based on your current level of coverage...

Id. at T00763.  Neither document contains a reservation of rights.  Dubman signed the Rogers letter as his acceptance of the severance agreement.  Id. at T00762.

On July 20, 1999 (four days after Smith retired), Margaret Smith sent Dubman another letter describing "the disposition of your various benefits and other Tetley programs upon your retirement."  This letter contains essentially the same information as the letter from Rogers, but also states: "Please be advised that Tetley reserves the right to change, amend or terminate the Tetley USA Inc. Retiree Medical Plan at any time." App. 17 at T00765.  Dubman signed the Smith letter on July 22, 1999.  Id. at T00768.

Plaintiffs Fondaco and DiBenedetto retired in February 1995 by accepting an early retirement package offered in connection with a plant closing for employees over age 55 with at least 10 years of Tetley service.  App. 18 at T00982-84, App. 19 at T00780-82.  The offer letter details the severance pay to which retirees would be entitled, and also states that they would be eligible for "continuation of the standard benefits offered presently to retiring employees under the Retiree Benefit Program. ...  As was mentioned in the Benefits Strategy Team update letter on November 30, '...management will do all that

10

they can to provide for your benefits now, [but] in the case of a
sale there are no guarantees that the status quo will be
maintained.' We cannot be sure what the Tetley benefit program
will be after a change in control."[4]  Id. (quotation marks and
alterations in original).  The benefits outline attached to this
letter states:

> Medical and Dental Coverage
> ...
> - Medical coverage is continued provided you make
> the required employee contribution.

Id.  It contains no reservation of rights and no information
concerning the future of the plan if the plant were to be sold.

Plaintiff Mayes's late husband retired in 1993, following
discussions of a severance agreement.  See App. 23 at T01010.  A
memo formalizing the discussions reflects that Mr. Mayes "will be
eligible for the Salaried Retirees' Benefit Programs beginning on
the date of your retirement, February 1, 1993."  Id.  An attached
benefits summary provides: "Medical and Dental Coverage: Medical
is continued provided you make the required employee
contribution."  Id. at T01012.[5]

---

[4]The record contains no evidence relating to the eventual
disposition of this Tetley plant.

[5]Mr. Mayes elected health coverage for himself and his wife.
App. 23 at T01014.  It is unclear from the record, though
immaterial, whether Mrs. Mayes now seeks continued benefits from
Tetley as a dependent or whether she seeks reimbursement for
health care costs incurred by her husband prior to his death.

Plaintiff Smith retired on January 1, 1992, after his contract as Vice President of Corporate Services was terminated on August 10, 1990.  App. 24 at T00886.  The individualized retirement agreement he signed with Tetley, dated June 14, 1991, states: "You will be eligible for the Salaried Retirees' Benefit Programs beginning on the date of your retirement... ."  Id. at T00887.  A retirement benefits summary prepared on October 31, 1991 stated that "as a retired employee, you are eligible to continue your family medical coverage with John Hancock. ...You will continue to pay 10% of the premium that Tetley pays to John Hancock."  Id. at T00891.  None of the letters sent to Smith contains any reservation of rights.

Plaintiffs claim that this language in the early retirement agreements promising eligibility for the salaried retiree medical benefits plan constitutes a promise of vested lifetime health benefits.  They further argue that Tetley breached its fiduciary duty in cancelling the retiree health benefit program and in failing to tell plaintiffs that their retirement benefits might be terminated.  Finally, they argue that Tetley is barred by principles of promissory estoppel from terminating their retirement health benefits.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits ... show that there is no genuine issue
as to any material fact and that the moving party is entitled to
a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party
seeking summary judgment "bears the burden of establishing that
no genuine issue of material fact exists and that the undisputed
facts establish [its] right to judgment as a matter of law."
Rodriguez v. City of New York, 72 F.3d 1051, 1060-1061 (2d Cir.
1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157
(1970)).  The non-moving party, in order to defeat summary
judgment, must then come forward with evidence that would be
sufficient to support a jury verdict in his or her favor.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) ("there
is no issue for trial unless there is sufficient evidence
favoring the nonmoving party for a jury to return a verdict for
that party"); Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
475 U.S. 574, 587 (1986) ("Where the record taken as a whole
could not lead a rational trier of fact to find for the nonmoving
party, there is no genuine issue for trial.") (citation and
internal quotation omitted).

The parties agreed at oral argument that there were no
disputed factual issues; their dispute concerns the inferences to
be drawn and the application of the law to these facts.

## III. DISCUSSION

### A.    Contractual Vesting

As both sides recognize, "ERISA does not create any substantive entitlement to employer-provided health benefits ... Employers ... are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 75, 78 (1995). However, if an employer promises vested benefits, that promise will be enforced under ERISA. Am. Fed'n. of Grain Millers, AFL-CIO v. Int'l. Multifoods Corp., 116 F.3d 976, 979 (2d Cir. 1997) ("Multifoods").

In the Second Circuit, an ERISA plaintiff who claims that his or her right to health benefits vested by contract may "get to a trier of fact based on ambiguous plan language." Kunkel v. Empire Blue Cross and Blue Shield, 274 F.3d 76, 83 (2d Cir. 2001). To survive summary judgment, "[i]t is enough to point to written language capable of reasonably being interpreted as creating a promise on the part of the employer to vest the recipient's benefits." Multifoods, 116 F.3d at 980 (internal quotation marks and citation omitted, emphasis in original).

### 1.    Regular Retirees

Plaintiffs who retired in the normal course, not pursuant to any early retirement plan, base their claims on the 1975 John Hancock insurance policy, and argue that having started working

14

for Tetley under this plan, they are now entitled to its benefits even though new plans were in effect when they retired. Defendants argue that the Hancock policy contains an express reservation of Tetley's right to cancel retiree health benefits,[6] and, in the alternative, that the language of the plan does not create vested lifetime health benefits for retirees.

The Hancock policy, as described <u>supra</u> § I.A, contains a grid listing the expiration of employment for benefits purposes during retirement as "indefinite." App. 1 at T00017. The grid read in the context of the paragraph preceding it, which explicitly says that employment will continue as listed in the grid <u>or</u> until the employer gives written notice to the employee that his or her employment is terminated for benefits purposes, can only reasonably be read as meaning that Tetley, as the employer, could terminate benefits for any retiree who would have been deemed an employee for insurance purposes.

---

[6]The language Defendant points to as a reservation of rights references the contract between Tetley and its insurer, not between Tetley and its employees or retirees. App. 1 at T00021 ("The Policyholder [Tetley] may terminate this policy at any time by giving written notice of termination to the Insurer" with 31 days notice.) The fact that Tetley reserved the right to change insurance carriers does not clearly address the issue of whether rights to continued health benefits were vested in its retirees. Likewise, the language that "no amendment, renewal or termination of this policy shall require the consent of or notice to any employee," <u>id.</u>, references the policy between Tetley and Hancock; it does not address whether Tetley had an obligation to provide continued health benefits to employees or retirees via a different policy should it end the Hancock contract.

15

The fact that the plan could be read to promise benefits for an "indefinite" period does not mean a promise of "lifetime" benefits as a matter of law.  The absence of durational language in a plan document does not create a binding obligation to vest benefits.  See Joyce v. Curtiss-Wright Corp., 171 F.3d 130, 135 (2d Cir. 1999); see also McMunn v. Pirelli Tire, 161 F. Supp. 2d 97, 115 (D. Conn. 2001).  In Joyce, plaintiffs argued that the lack of any durational language in a contract operated to entitle them to lifetime benefits.  The Second Circuit disagreed, holding that the dispositive issue was whether plaintiffs could meet their burden of "identify[ing] language that affirmatively operates to imply vesting."  Id. at 135 (emphasis supplied).  Thus the fact that the 1975 Hancock agreement has no termination date nor an express provision that Tetley may terminate retiree benefits at any time, does not operate to create a vested right to lifetime benefits.

Plaintiffs' reliance on Abbruscato v. Empire Blue Cross and Blue Shield, 274 F.3d 90, 97-98 (2d Cir. 2001), as supporting their claim that this plan language could be considered a promise of continued benefits, is misplaced.  In Abbruscato, the plan document actually stated that employees were "eligible for lifetime health insurance and life insurance coverage."  Id. at 97 (emphasis added).  There is a material difference in the durational connotation of the term "indefinite" and the term

16

"lifetime."  A "lifetime" period extends until the death of the
insured.  An "indefinite" period does not end on any particular
date and is not measured by the life of the retiree; it means
only that there is no predetermined end date, whereas "lifetime"
contains its own termination measure.  Accordingly, a promise of
"indefinite" employment for benefits purposes is not a promise of
"lifetime" benefits as a matter of law.

        Plaintiffs further argue that Tetley was not free to alter
its promise of retirement benefits to qualifying retirees once
they started their performance by working for the company,
relying on Kunkel v. Empire Blue Cross and Blue Shield, 274 F.3d
76 (2d Cir. 2001).  Indeed, in Kunkel, the Second Circuit held
that an employer was not free to revoke life insurance covering
its employees, which was promised by an SPD stating that "retired
employees, after completion of twenty years of full-time
permanent service and at least age 55 will be insured."  Kunkel,
274 F.3d at 84 (emphasis in original).

>       [T]his statement can be reasonably read as promising
>       such insurance so long as employees retire after age 55
>       and have provided full-time permanent service to Empire
>       for at least twenty years.  This provision can be
>       construed as an offer that specifies performance as the
>       means of acceptance - sometimes referred to as an offer
>       for a unilateral contract - and promises lifetime life
>       insurance benefits upon performance.  Where the offeror
>       did not explicitly reserve the power to revoke, such an
>       offer cannot be revoked once the offeree has begun to
>       perform.

Id.  The Kunkel plaintiffs also invoked an SPD statement that

life insurance benefits "will remain at the annual salary level for the remainder of their lives." Id. at 85 (emphasis in original).  The Second Circuit held that "[s]uch 'lifetime' language ... is sufficient to create a triable issue of fact as to whether [defendant] promised to vest retiree life insurance benefits at the stated level." Id.

The factual distinctions between the 1975 John Hancock policy and SPD at issue here, and that in Kunkel, are dispositive.  The Hancock contract contains no durational measurement by "lifetime."  It states only that employment will be deemed to continue for an "indefinite" period for purposes of benefits coverage for retirees.  App. 1 at T00017.  It does not define retirement as beginning at a certain age and/or after a certain number of years of service.  There is no language in the plan that could be found to induce an employee to work a particular number of years, or until a particular age, under the belief that he or she then would have attained lifetime coverage under the retiree health plan.

Similarly, the 1975 SPD is silent on the subject of any eligibility requirements.  Confusingly, it omits reference to health benefits entirely, using the phrase "Retirement, Life Insurance only - indefinitely." App. 4 at T00514 (emphasis supplied).  While this is clearly an incorrect summary of the John Hancock plan document, it does not mislead an employee into

18

believing that he or she would receive lifetime retirement health benefits in return for a specific age or service attainment.

The SPD in effect between 1982 and 1985 summarizes the Hancock plan for benefits purposes as: employment terminates the month after the cessation of active work, except "Retirement, all coverages except Accidental Death and Dismemberment Insurance - indefinitely." App. 4 at T00571. This language cannot be construed as an offer of lifetime benefits for employees who work a certain number of years or to a certain age.

There is nothing in the early plan documents, therefore, that could be interpreted as promissory language for lifetime retiree benefits, and since ERISA does not require provision of such benefits, nothing prevented Tetley from eliminating retirement health benefits while the plaintiffs were employed. Thus the operative plan documents for these plaintiffs are those in effect at the time they retired, not when they began work for Tetley. It is uncontested that the 1985 SPD and all subsequent SPDs contained explicit reservations of Tetley's right to terminate the retiree health benefits program at will. Because these are the operative SPDs, Tetley had effectively reserved its right to terminate its retiree medical coverage at any time, even after the plaintiffs retired.

The regular retirement plaintiffs argue that the "exit letters" they received from Tetley upon their retirement promised

them lifetime health benefits during retirement because the letters contained no reservations of rights.  However, the meaning of the plan documents is unambiguous, and thus extrinsic evidence is inadmissible to contradict this meaning.  <u>Cf.</u> <u>Abbruscato</u>, 274 F.3d at 98.  This rule gives effect to ERISA's requirement that plans and SPDs be the primary means of informing beneficiaries and participants of their and their employer's rights and obligations under the plans.  <u>See</u> <u>Moore v.</u> <u>Metropolitan Life Ins. Co.</u>, 856 F.2d 488, 492 (2d Cir. 1988).

### 2.   Early Retirees

The plaintiffs who accepted early retirement packages from Tetley rely on letters that they say promised health benefits in exchange for an agreement to retire early from the company.

### (a)   Adams

Although Adams states that she took early retirement, <u>see</u> Adams Aff., App. 15 ¶ 3, T00908, the record does not reflect that she participated in any incentive program or individualized early retirement negotiations with Tetley.  In the weeks prior to her retirement, she received two letters from Benefits Administrator William Vazquez outlining "the benefits to which [she was] entitled upon [her] retirement," and specifying that she would be "eligible to continue [her] family medical coverage through John Hancock" for a monthly premium of $37.50.  App. 15 at T00910-11, T00914-15.  Neither letter contains a reservation of Tetley's

right to terminate the retiree medical program.  However, neither
letter promises any separate or different health benefits than
those to which all Tetley retirees were entitled in 1991 when
Adams retired.  Thus there is no evidence that Tetley promised
Adams lifetime health benefits in exchange for her early
retirement.  Her claim is governed by the general retiree medical
benefits provisions which, as discussed above, also do not
promise lifetime health benefits.

> **(b)  Dubman**

The individualized retirement agreement that Dubman
negotiated with Tetley could not reasonably be interpreted as an
offer of vested health benefits through the age of 65 in exchange
for Dubman's promise to retire early.  As described <u>supra</u>, §
I.B.2, Dubman is the only plaintiff who states that he actually
received an oral promise from Tetley personnel that he would get
"lifetime" health coverage.  However, that conversation occurred
over one year prior to Dubman's retirement date.  The written
severance paperwork, which Dubman signed, contains no promise of
lifetime benefits.  The July 12, 1999 Rogers letter states that
Dubman is entitled to participate "in <u>the</u> retired employees'
Medical... Plan[]."  App. 17 at T00760.  It does not promise any
separate health benefits -- other than those to which all other
retirees were entitled -- in exchange for early retirement.
Instead, it refers to the general retiree medical plan, governed

by the SPD in effect at the time.  More importantly, the Smith
letter of July 20, 1999, which Dubman also signed, contains an
explicit reservation of Tetley's right to terminate the retiree
medical program.  Id. at T00765.  Because Dubman signed both of
these papers, they necessarily supercede any contradictory oral
representations made to him over one year prior.  Thus Dubman's
agreement did not promise him lifetime medical coverage and the
regular retirement plan, which contains no vested right to
retiree health benefits, controls.

### (c)  Fondaco and DiBenedetto

The early retirement offer letter provided to plaintiffs
Fondaco and DiBenedetto stated that employees accepting offer
would "be eligible to retire under the Retirement Plan for
Salaried Employees of Tetley Inc. with continuation of the
standard benefits offered presently to retiring employees under
the Retiree Benefit Program."  App. 18 at T00982, App. 19 at
T00780 (emphasis added).  It then states that "there are no
guarantees that the status quo will be maintained" with respect
to retirement benefits after a change in control.  Id.  An
attached benefits summary provides that "Medical coverage is
continued provided you make the required employee contribution."

As with Dubman, the health benefits offered Fondaco and
DiBenedetto are those available under "the Retirement Plan for
Salaried Employees."  Id. (emphasis added).  In fact, it is even

clearer than Dubman's contract in that the "<u>standard</u> benefits <u>offered presently</u> to retiring employees" are specified.  <u>Id.</u> (emphasis added).  The letter does not suggest that any new or different health benefits would be offered as consideration for early retirement.  Rather, by the terms of the offer, enhanced severance pay was to be the added incentive to take early retirement.

Read in the context of the letter, the attached benefits outline merely summarizes the benefits to which Tetley retirees were then entitled.  It does not purport to be an SPD.  As is evident from the letter itself, Tetley made no guarantees about retiree health benefits once the plant was sold.

### (d)  **Mayes and Smith**

Unlike the letter sent to Fondaco and DiBenedetto, the retirement agreements with Smith and Mayes did not contain express reservations of rights.  App. 23 at T01010, App. 24 at T00879.  However, as with the previously-discussed plaintiffs, Smith's and Mayes' agreements entitle them only to the benefits contained in Tetley's current retiree benefit programs.  <u>See</u> App. 24 at T00887 ("You will be eligible for the Salaried Retirees' Benefit Programs beginning on the date of your retirement...").  The agreements do not reference any new or different health benefits as consideration for the plaintiffs' taking early retirement.  While separate election forms prepared by Tetley do

23

state that medical insurance "is continued," provided that Smith and Mayes pay certain amounts toward the premium, App. 23 at T01016, App. 24 at T00891, they do not purport to be official plan documents and they lack any promissory language that could be read as vesting benefits for the plaintiffs' lifetimes. Joyce, 171 F.3d at 135.

### 3. Conclusion

In sum, the Court finds as a matter of law that the language in the applicable plan documents and the early retirement contracts is unambiguous. The 1975 Hancock plan contains no language that reasonably could be interpreted as a promise of vested lifetime health benefits, and it is undisputed that after 1985 all plan documents contained full reservations of Tetley's rights to end the retiree health plan. The early retirement agreements under which plaintiffs Adams, Dubman, Fondaco, DiBenedetto, Mayes, and Smith retired provide only the same retirement benefits as afforded to all other retirees; no separate or additional health benefits were part of the bargain. For these reasons, Tetley is entitled to judgment as a matter of law on plaintiffs' claims that the retirement plan documents entitled them to lifetime health benefits that could not be terminated.

**B.  Breach of Fiduciary Duty**

Plaintiffs also contend that Tetley breached its fiduciary duties, as set forth in 29 U.S.C. § 1104(a):[7]

> (1) ...a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
> ...
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> ...
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA].

The Court has found that Tetley did not breach its contractual duties to plaintiffs under the applicable plan documents.  Therefore plaintiffs' claims under 29 U.S.C. § 1104(a)(1)(D) must fail.  Cf. Kunkel, 274 F.3d at 87.  However, "even if there was no promise to vest the [health] insurance benefits, [Tetley] may have still violated any fiduciary duties in its retiree letters and other communications ..."  Id. at 88.

Under ERISA, an employer acting as a fiduciary is required to deal truthfully and honestly with plan beneficiaries.  Varity Corp. v. Howe, 516 U.S. 489, 506 (1996).  "To establish a claim

---

[7]Plaintiffs' complaint asserts only a breach of fiduciary duty by failing to administer the plan according to plan documents, in violation of 29 U.S.C. § 1104(a)(1)(D).  However, both parties briefed the claim under subsection (B) as well as (D), and the issue was fully explored at oral argument, so the Court will consider both arguments.

for breach of fiduciary duty based on alleged misrepresentations concerning coverage under an employee benefit plan, a plaintiff must show: (1) that the defendant was acting in a fiduciary capacity when it made the challenged representations; (2) that these constituted material misrepresentations; and (3) that the plaintiff relied on those misrepresentations to their [sic] detriment." James v. Pirelli Armstrong Tire Corp., 305 F.3d 439, 449 (6th Cir. 2002); see also Ballone v. Eastman Kodak Co., 109 F.3d 117, 122, 126 (2d Cir. 1997).  An administrator may breach its fiduciary duty either through "affirmative misrepresentations" or "failure to provide completely accurate plan information."  Kunkel, 274 F.3d at 89.

The defendant does not contest for purposes of summary judgment that Tetley, through its employees, was acting in a fiduciary capacity when it communicated with plaintiffs concerning the retirement benefits to which they were entitled. The issue is whether Tetley breached its fiduciary duty by failing to qualify the information it provided to plaintiffs on some occasions with statements that the benefits programs might change in the future.

The only statement in the record affirmatively promising "lifetime" benefits was made by Tetley executives Pettrizzo and Rogers to Plaintiff Dubman, in response to a question during a meeting in 1998.  See Dubman Aff. ¶ 6.  Undoubtedly this

26

statement was a material misrepresentation of the benefits available to Dubman under the plan.  However, Dubman could not reasonably have relied on this misrepresentation, because the next year he signed a written severance agreement that contained no "lifetime" promise, and a benefits summary that contained an explicit reservation of Tetley's right to terminate the retiree medical plan; there is no evidence in the record that Dubman contemporaneously objected to the written documents as incorrect or incomplete codifications of his separation agreement with Tetley.  Thus Dubman's breach of fiduciary duty claim fails the third prong of the test.

Plaintiff Cerreta identifies one written statement by Margaret Smith of Tetley that if he retired "before 1/1/92" his health insurance "contribution remains the same, for life."  App. 16 at T00933.  This arguably also misrepresents Tetley's plan, to the extent it could imply that benefits would remain in place for Cerreta's life had he retired in 1991.  However, Cerreta retired on March 1, 1992, id. at T00934, which is after the date specified in Smith's note, and therefore he could not reasonably have relied on Smith's statement as a promise of lifetime health benefits.

None of the remaining plaintiffs point to any "lifetime" promise made by Tetley representatives either orally or in writing.  They show that some Tetley communications lacked

27

reservations of the company's right to terminate the retiree health plan, though as plaintiffs acknowledged at oral argument, Tetley was not required to include such a statement in each and every letter or conversation.  Sprague v. General Motors Corp., 133 F.3d 388, 405 (6th Cir. 1998) (holding defendant did not breach its fiduciary duty when it "did not tell the early retirees at every possible opportunity that which it had told them many times before--namely, that the terms of the plan were subject to change." A company need not "begin every communication to plan participants with a caveat.") Plaintiffs' evidence also shows that defendant's representatives failed to place any particular time frame on their descriptions of the health plan, but a "simple statement by a fiduciary that benefits 'will continue in retirement' without any durational limit is not a material misrepresentation because the statement is neither untrue or misleading, and could not create a reasonable expectation that benefits had vested." McMunn, 161 F. Supp. 2d at 123.  The fact that Tetley's informal letters or oral statements did not "contain[] language explicitly limiting the plan's duration" is not, as a matter of law, actionable under ERISA.  Joyce, 171 F.3d at 135.

     If a fiduciary has deliberately fostered a misleading belief that beneficiaries are entitled to lifetime coverage, or has failed to provide employees with plan documents so they can read

28

the reservation language, or has otherwise prevented them from verifying the details themselves, then the fiduciary may have breached its duty.  See McMunn, 161 F. Supp. 2d at 124.  Here, however, plaintiffs make no such allegations.  Plaintiffs do not allege that Tetley deliberately or willfully misinformed them, although they suggest, not unreasonably, that Tetley was encouraging early retirement.  Other than Dubman and Cerreta, see supra, the plaintiffs do not allege that they pointedly asked Tetley about the future of their benefits and received incorrect or misleading information or silence in response; in fact, all of Tetley's statements to Adams, Jenkins, Johnson, Lattini, DiBenedetto, Fondaco, Mayes and Smith, were accurate as to the plan in existence at the time.  Plaintiffs do not allege that the SPDs were unavailable.  Nor do they allege that the post-1985 SPDs were unclear as to Tetley's right to cancel the retirement benefits program.

Plaintiffs' understanding that Tetley had promised them lifetime benefits was based on a misapprehension that "retirement" or "continued" benefits equated to "lifetime" benefits.  However, this is not an objectively reasonable interpretation of the plans in effect when the plaintiffs retired, and there is no evidence that Tetley intended to create this misunderstanding.  In sum, there is no evidence in the record that Tetley breached its duty to act "with the care,

skill, prudence and diligence" required of a fiduciary.  29 U.S.C. § 1104(a)(1)(B).  Having found that there is no disputed issue of material fact concerning the content of informal written and oral statements from Tetley to plaintiffs, and having concluded that these statements were not in violation of Tetley's fiduciary duties, defendant's motion for summary judgment will be granted on this claim.

### C.   Promissory Estoppel

The early retirement plaintiffs also claim relief under a theory of promissory estoppel.  Both sides agree that an ERISA plaintiff can succeed on a claim of promissory estoppel by showing five elements:  "(1) a promise, (2) reliance on the promise, (3) injury caused by the reliance,... (4) an injustice if the promise is not enforced," as well as "extraordinary circumstances."  Kunkel, 274 F.3d at 85 (internal citations and quotation marks omitted).

Plaintiffs' claim fails on the first element because they can point to no language in any SPD or any informal communication from Tetley that reasonably could be construed as a promise of lifetime benefits.  They assert that "it was their understanding that Tetley had promised lifetime medical benefits...," Mem. in Opp. at 21 (emphasis added), but the standard is objective, not subjective.  Abbruscato, 274 F.3d at 101 (test is whether the plan documents contain language that could "reasonably be

interpreted as a promise."). As the Court has found above, the language of the SPDs cannot reasonably be interpreted as a promise of lifetime benefits, nor can the fact that various informal letters and communications neglected to reiterate Tetley's reservation of rights contained in the applicable SPD reasonably be interpreted as a promise of lifetime benefits. While Tetley representatives mentioned a possibility of "lifetime" health coverage to Dubman the year prior to his retirement, this comment is not reasonably interpreted as a promise in light of the subsequent written agreement he signed. Therefore the plaintiffs' promissory estoppel theory is unavailing as a matter of law and cannot preclude summary judgment for defendants.

**IV.   CONCLUSION**

Accordingly, Tetley's Motion for Summary Judgment [doc. #21] is GRANTED.  The Clerk is directed to close this case.

IT IS SO ORDERED.


_____/s/_____
Janet Bond Arterton, U.S.D.J.


**Dated at New Haven, Connecticut, this 8th day of March, 2005.**